The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the plaintiff and the defendant-employer.
3. The issue before the Industrial Commission is whether the plaintiff suffers from a compensable work related occupational disease.
4. The following were also admitted into evidence by stipulation:
a) The deposition transcript of Dr. Pressley and Dr. Naso.
b) Answers to defendant's Pre-Hearing Interrogatories.
c) Plaintiff's recorded statement.
d) The deposition transcript of the plaintiff date October 17, 1994.
e) The average weekly wage as established by the Form 22.
f) A package of medical records.
*******************
The Full Commission rejects the findings of fact by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of hearing, plaintiff was 38 years old and had been employed by defendant, U.S. Air, Inc. for approximately nine years.
2. Plaintiff is alleging that he contracted an occupational disease diagnosed as tardy ulnar palsy, or ulnar nerve compression as a result of his job duties at U.S. Air, Inc.
3. The plaintiff's job as a participating ramp service supervisor required him to make sure baggage was timely loaded on the assigned flights, to assist with loading and unloading of baggage and to perform certain administrative duties. Plaintiff usually did about 30 minutes of administrative work at the beginning of a shift and then assisted with the loading and unloading of planes during the rest of his shift. On average, it took about an hour to load and unload each plane. The average weight range of the baggage was between one and 120 pounds. Plaintiff's job did not require him to participate in the loading and unloading of baggage continuously throughout the day; however, it was only rarely that he did not participate in some loading and unloading of every plane. Unloading and loading baggage required reaching, twisting, pulling, pushing and lifting motions. Overhead reaching was frequently required.
4. Plaintiff worked with commuter flights. Five to six planes would come in at one time for loading and unloading. This was called a complex and the loading and unloading of a complex would take about an hour. There would usually be a break of 10 to 20 minutes between complexes. Except on rare occasions, plaintiff was involved with loading and unloading from the time the planes came in until the loading was complete. In each day shift, there would be six complexes and one mini complex of only three planes. During an eight and a half-hour shift, plaintiff would assist with the loading and unloading of baggage for somewhere between six and seven hours during that shift. There was no conveyor belt for loading and unloading. Bags were normally lifted from the ground, or a baggage cart about two feet off the ground and placed on luggage bins at approximately shoulder height. Plaintiff estimated the average weight of the bags to be between 35 to 45 pounds and defendant's evidence indicates that the average weight of the bags was 25.5 pounds. Loading and unloading of baggage required repetitive motions of the wrist and hands from "palm up" to "palm down" position while lifting items up to and often above shoulder height. Loading and unloading of baggage was done hurriedly as it was plaintiff's job to make sure that planes departed on schedule.
5. On August 14, 1993, the plaintiff was working with one or two other people unloading baggage from a plane. The usual size of his crew was 4-5 persons, but he was short on staff that day. While unloading a plane without assistance, plaintiff noticed that his left arm was hurting in the elbow region. At that time, the plaintiff did not think much about his arm hurting as he was used to having bumps and bruises on the job. He could not, however, recall bumping his arm that day. As the day went on, the plaintiff noticed that every time he unloaded a plane, his arm would ache and by the end of the day, the pain was worse. Plaintiff filled out an injury report.
6. The plaintiff initially received treatment for left arm pain on August 22, 1993 at Mercy Hospital in Charlotte. At that time the plaintiff was diagnosed with left elbow bursitis and tendinitis. The plaintiff was told to wear a sling for three to four days and was given a prescription of Ibuprofen.
7. Plaintiff then presented to Dr. William Nagel of Work Well on August 25, 1993. At that examination the plaintiff was diagnosed with a contusion of the elbow and ulnar nerve injury. The plaintiff was placed on light duty and told to return for re-examination on September 1, 1993. The light duty provided for the plaintiff enabled him to continue working as a ramp service supervisor, however, his duties were modified so that he could avoid loading and unloading any baggage. At the re-examination on September 1, 1993 by Dr. Nagel, the plaintiff was told to continue working light duty with no use of his left arm. He was also referred to an orthopedist.
8. On September 8, 1993 the plaintiff presented to Dr. James Pressley, orthopaedist, for an examination of his left elbow. Dr. Pressley diagnosed tardy ulnar palsy and released plaintiff to return to full duty work. Plaintiff returned to Dr. Nagel on September 10, 1993 at which time he was taken out of work.
9. Nerve conduction studies and EMGs of the plaintiff's left upper extremity were taken by Dr. Ronald Demas at Demas Neurology and Medical Rehabilitation on September 14, 1993. The nerve conduction studies revealed left ulnar compression neuropathy at the elbow. Upon reviewing the nerve conduction and EMG studies on September 14, 1994, Dr. Nagel released plaintiff to return to light duty work with no use of the left arm.
10. On September 17, 1993, Dr. Pressley examined the plaintiff's nerve conduction and EMG studies and recommended that the plaintiff undergo surgery for an anterior transposition of the nerve. Dr. Pressley did not, however, see a need to rush the surgery. At that time, the plaintiff was continued on light duty work. On September 27, 1993, the plaintiff returned to Dr. Nagel for a final examination at which time he was kept on light duty work. At the last examination performed by Dr. Pressley on October 20, 1993, Dr. Pressley continued his recommendation that a transposition of the nerve and release of the flexor should be performed although he released the plaintiff to full duty without any restrictions.
11. Dr. Stephen J. Naso, Jr. who was tendered and stipulated to be an expert in occupational diseases of the hand, was of the opinion that plaintiff's job involved repetitive lifting; that plaintiff contracted a condition called ulnar nerve compression syndrome; that plaintiff's job contributed to his condition and that plaintiff's job placed him at a greater risk than the public in general for contracting ulnar nerve compression syndrome.
12. Dr. James A. Pressley, an expert in the area of orthopedic surgery who first treated plaintiff on September 8, 1993, diagnosed plaintiff's condition as tardy ulnar palsy which is an irritation of the ulnar nerve. Direct trauma and repetitive use are two of the possible causes of tardy ulnar palsy. Dr. Pressley was of the opinion that plaintiff's job duties constitute repetitive lifting. Dr. Pressley opined that it is possible that plaintiff's tardy ulnar palsy came from his job duties, however, he could not state with complete medical certainty that the job caused the condition. He did opine that if plaintiff's job did not cause the condition, "It would certainly irritate it". Dr. Pressley further opined that if plaintiff had no real symptoms of the elbow before August 14, 1993, the day that he had to do excessive or extreme lifting, that plaintiff's job probably contributed to his tardy ulnar palsy. Dr. Pressley further opined that someone who performs repetitive motion such as plaintiff would probably have a greater risk of contracting tardy ulnar palsy than the public in general. Dr. Pressley believes that plaintiff's condition will require surgery. Greater weight is accorded the testimony of Dr. Stephen J. Naso over that of Dr. James A. Pressley on the issues of whether plaintiff's job placed him at an increased risk of contracting tardy ulnar palsy and whether plaintiff's job either caused or significantly contributed to the development of his tardy ulnar palsy.
13. Plaintiff's job as a ramp service supervisor was repetitive in nature. Plaintiff's job either caused or significantly contributed to the development of tardy ulnar palsy. Plaintiff's job placed him at an increased risk of developing tardy ulnar palsy.
14. Plaintiff has contracted a compensable occupational disease.
15. Plaintiff has missed less than seven (7) days from work as a result of his occupational disease.
16. Plaintiff is likely to require surgery in the future for his occupational disease.
17. Plaintiff's average weekly wage shall be determined from a Form 22 wage chart which shall be submitted by defendant.
*******************
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following
CONCLUSIONS OF LAW
1. As a result of his employment with the defendant-employer, plaintiff has contracted an occupational disease which is due to causes and conditions characteristic of and peculiar to his employment with defendant-employer. Plaintiff's employment placed him at an increased risk of developing tardy ulnar palsy or ulnar nerve compression syndrome when compared to the public in general. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's occupational disease is compensable.
3. Plaintiff is entitled to such medical treatment as is reasonably required to effect a cure, provide relief and/or would tend to lessen his period of disability.
4. Plaintiff is not entitled to any temporary total disability compensation at this point as he has missed less than seven (7) days from work due to his compensable occupational disease. N.C. Gen. Stat. § 97-28.
5. Plaintiff has not reached maximum medical improvement and it is likely that surgery will be required.
**********************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Plaintiff's claim for compensation due to an occupational disease is ALLOWED.
2. Defendant shall provide to plaintiff such medical treatment as is reasonably required to effect a cure, provide relief and/or would tend to lessen plaintiff's period of disability, including any future surgery which may be recommended for plaintiff's compensable occupational disease. Defendant shall pay all medical expenses when bills for same have been submitted and approved through procedures adopted by the Industrial Commission.
3. The issue of what amount of, if any compensation may be due plaintiff in the future is reserved for subsequent determination as plaintiff has not reached maximum medical improvement and may require surgery.
4. Defendant shall pay the costs due this Commission.
*******************
ORDER
IT IS HEREBY ORDERED that defendant shall submit to the Industrial Commission a completed Form 22 wage chart within 60 days.
 S/ ___________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ________________________ J. RANDOLPH WARD COMMISSIONER
S/ ________________________ LAURA K. MAVRETIC COMMISSIONER
BSB:md